# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00097

ZVELO, INC., a Delaware corporation,

    Plaintiff,

v.

AKAMAI TECHNOLOGIES, INC., a Delaware corporation,

    Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff zvelo, Inc. ("zvelo"), by and through its undersigned counsel, Kutak Rock LLP, and for its Complaint and Jury Demand against Akamai Technologies, Inc., ("Akamai"), states and alleges as follows:

**I.  PARTIES.**

1. zvelo is a Delaware corporation with its principal place of business at 8350 East Crescent Parkway, Suite 450, Greenwood Village, Colorado 80111.

2. Akamai is a Delaware corporation with its principal place of business at 150 Broadway, Cambridge, Massachusetts 02142.

**II. JURISDICTION AND VENUE.**

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (original jurisdiction) as the action arises under the laws of the United States and pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

4. This Court has personal jurisdiction over Akamai because Akamai does business in this judicial district; because Akamai's commission of tortious acts reaches this judicial district; and because many of the activities regarding misappropriation and dissemination of trade secrets and highly confidential information occurred or are occurring in this judicial district.

5. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to zvelo's claims occurred in this judicial district.

## III. GENERAL ALLEGATIONS.

### A. Internet Web Filtering.

6. Access to certain Internet websites, social media sites, or other forms of web-based communication may impact employee productivity, impair network performance, contain objectionable content and/or violate any number of legal, moral, or ethical rules.

7. As a result, many companies increasingly find themselves in the market for technology that will allow them to filter or block selective Internet websites, social media, and other forms of web-based communications.

8. Each page on a website has a unique address that is typically referred to as a Uniform Resource Locator or "URL." Most websites differ in form and content. The wide range of differences can make the filtering process difficult. One method to overcome this problem is to assign categories to each unique URL based on the content that is displayed on the site. Categories can range from "news" to "pornography" to "malicious software."

9. A URL filtering solution allows a user to select different categories and to use those categories to filter access to a particular URL. For example, a user may choose to block access to all URLs that are categorized as "gambling" or "streaming video." Similarly, a user may choose to block access to a link to an Internet website that is contained in an email based on how that Internet website has been categorized.

10. To enable this type of category-based filtering, each unique URL must be accurately categorized based on the content that appears on the web page. As a result, the most critical component of a URL filtering solution is its database of categorized URLs.

11. Critical points of differentiation among companies that provide databases of categorized URLs are (1) the number of URLs that have been categorized in the product's database, (2) the scope and breadth of the available categories; (3) the accuracy of the categorizations; and (4) the frequency with which the URLs are updated.

**B. zvelo's Proprietary Technology.**

12. zvelo, a Colorado-based corporation, offers a proprietary database of categorized URLs that is incorporated into offerings from many of the leading network security and web filtering vendors for domain name system ("DNS") filtering, content filtering, Internet web filtering, parental controls, content categorization and more. Collectively, these offerings are used by tens of millions of people around the globe.

13. Over the past decade, zvelo has invested tens of millions of dollars in developing the zveloDB™ URL database ("zveloDB").

14. The zveloDB contains multiple types of proprietary information. Through its proprietary processes and technology, zvelo compiles data regarding URLs actively being visited

to formulate a proprietary understanding of what constitutes the active web (the "zvelo Active Web"). The zvelo Active Web changes on a daily basis and staying abreast of URLs as they become active or inactive is valuable. The zvelo Active Web is unique and valuable intellectual property that would be both technically and practically challenging for another company to recreate.

15. In addition to the zvelo Active Web, the zveloDB contains zvelo's proprietary categorizations of each URL contained in the zvelo Active Web. zvelo has developed systems and services that allow zvelo to categorize with a high degree of accuracy the millions of URLs that make up the zvelo Active Web. To assist its efforts to categorize the zvelo Active Web, zvelo has also developed a unique and proprietary taxonomy of hundreds of categories that allows zvelo to more accurately categorize URLs with greater granularity than any of its competitors as well as to provide the users of the zveloDB with a greater breadth of categorization options.

16. As part of its development of the zveloDB, zvelo has developed proprietary content classification and malicious detection systems, including one of the most advanced AI/machine learning services in the industry.

17. In addition, zvelo has invested tens of thousands of hours compiling the training and testing data used in creating and maintaining the zveloDB.

18. As a result of zvelo's investment of time and effort, the zveloDB includes billions of categorized URLs from a taxonomy of nearly 500 categories and covers 99.9% of active websites.

19. The zveloDB provides users with an unparalleled advantage over less accurate and less comprehensive databases that cover a substantially smaller portion of the active web.

### C. zvelo's Efforts to Protect the Secrecy of the zveloDB

20. To protect its competitive advantage, zvelo has taken numerous steps to ensure the confidentiality of the proprietary and valuable zveloDB.

#### 1. zvelo's internal measures to protect the zveloDB.

21. zvelo stores the zveloDB on a secure server. The zveloDB is not available on zvelo's intranet or through a general log-in. Rather, to access the zveloDB, a user ID and a password that is specifically associated with the user ID must be entered. zvelo promptly disables a user ID and associated password if access to the zveloDB is no longer necessary.

22. zvelo maintains records of each person who accesses the zveloDB as well as records of every change that is made to the zveloDB.

23. Less than five zvelo employees are allowed to access the entirety of the zveloDB or to make changes across the database. Other zvelo employees and contractors are allowed limited access to the zveloDB for the sole purpose of submitting new URLs or categorizations during the course of performing their required job functions.

24. All zvelo employees and/or contractors who access the zveloDB or who submit URLs or categorizations to the zveloDB have executed confidentiality agreements that strictly prohibit them from disclosing any portion of the zveloDB without authorization.

#### 2. zvelo's measures to protect third-party access to the zveloDB.

25. zvelo strictly controls access by third parties to the zveloDB. Potential customers are required to execute a strict confidentiality and non-disclosure agreement before they are

allowed access to the zveloDB. In addition to prohibiting use of the zveloDB other than for purposes of evaluation and prohibiting disclosure of the zveloDB, these agreements require the immediate removal of the zveloDB upon completion of an evaluation.

26. If a customer decides to use the zveloDB for commercial purposes, the customer must execute zvelo's standard license agreement.

27. Pursuant to the terms of zvelo's standard license agreement, licensees of the zveloDB are provided with a non-exclusive, non-transferable license to use the zveloDB solely in connection with their products and services that offer content-filtering functionality.

28. Licensees are required (1) not to disclose the zveloDB, (2) to limit access to the zveloDB to authorized employees and contractors who require access to perform their job functions and who are bound by appropriate confidentiality and non-disclosure agreements, and (3) to take appropriate actions to maintain and protect the security of any computer system that is used to store the zveloDB or any portion thereof.

29. Licensees are strictly prohibited from, among other things, copying, reverse-engineering, reproducing, or distributing the zveloDB as a standalone product.

30. zvelo provides its licensees with rotating credentials which change continuously. As a result, a licensee is required continuously to update its credentials in order to access the zveloDB.

31. zvelo's standard license agreement requires a licensee to remove any portion of the zveloDB from their computer systems upon the termination or expiration of the license agreement.

32. zvelo's standard license agreement provides zvelo with audit rights to ensure compliance with all of the terms of the license, including to inspect a customer's computer systems to ensure that all portions of the zveloDB have been removed following termination of the license.

33. As an additional safeguard against unauthorized use of the zveloDB, zvelo includes proprietary information known as "markers" within the zveloDB that are known only to zvelo and that can be used to determine if a commercial product or service is utilizing the zveloDB. If zvelo has reason to believe a customer has not removed the zveloDB after termination or expiration of a license, zvelo can utilize the markers to audit whether the customer has engaged in unauthorized use of the zveloDB.

**D.      Commercial Use of the zveloDB.**

34. The zveloDB is not designed to be a standalone product. Rather, it is intended to be incorporated by original equipment manufacturers ("OEMs") and service providers into products and services that offer web, DNS, or URL filtering functionality in addition to other security and Internet management applications.

35. URL filtering functionality is critical to allowing an enterprise to, among other things, control access to websites, enforce bandwidth and/or time limit restrictions, and conduct unified enforcement and management across all aspects of web security.

36. In a typical deployment, zvelo's customers will provide a product or service, such as DNS filtering, that queries and retrieves information from the zveloDB related to category classifications for particular URLs. The product or service then uses the category classification to determine whether access should be granted to the URL.

37. The zveloDB may be deployed by zvelo's customers on-site in the form of a copy downloaded onto a server or it may be accessed remotely in the form of queries sent over the Internet to zvelo's servers.

38. If a queried URL does not exist in the zveloDB, the URL is automatically submitted to zvelo for processing, incorporation into the zvelo Active Web, classification, and malicious detection.

39. zvelo requires its licensees to pay license fees for use of the zveloDB. The license fee is typically based on the number of end users of the product or service that utilizes the zveloDB. Licensees generally report to zvelo monthly or quarterly the number of users to whom they have licensed solutions that integrate the zveloDB. On occasion, zvelo enters into licenses with fixed annual fees. The zvelo license agreement specifically prohibits the relicensing of the zveloDB unless it is incorporated into an OEM solution.

40. Generally, the license reports submitted by zvelo's licensees include the identity of the enterprises to whom they are selling or licensing products or services that rely on the zveloDB.

**E.  Akamai's Use of the zveloDB.**

41. Akamai offers for sale or licensing products or services that provide URL filtering functionality, including but not limited to the AnswerX recursive DNS solution.

42. Using information made available to the public by Akamai as well as security measures that it incorporated into the zveloDB, zvelo was able to form a reasonable belief that Akamai's products and services that provide URL filtering functionality, including but not limited to AnswerX, utilize the zveloDB.

43. In particular, Akamai's products and services that provide URL filtering functionality, including but not limited to AnswerX, rely on information contained in the zveloDB and utilize the proprietary URLs and categorizations incorporated by zvelo into the zveloDB.

44. zvelo has not provided Akamai with a copy of the zveloDB nor has zvelo allowed Akamai to query the zveloDB remotely.

45. zvelo has not granted Akamai a license to use the zveloDB.

46. zvelo has not provided Akamai with access to the zveloDB.

47. None of zvelo's licensees have reported to zvelo that they have distributed products or services that rely on the zveloDB to Akamai for re-sale.

48. None of zvelo's licensees of the zveloDB have reported to zvelo that they provided the zveloDB to Akamai.

49. Neither Akamai nor any of zvelo's licensees have paid zvelo license fees based on Akamai's use of the zveloDB.

50. On August 3, 2018, zvelo sent Akamai a letter stating, among other things, that Akamai was using the zveloDB without permission and that such unauthorized use should cease immediately.

51. Upon information and belief, Akamai continued to utilize the zveloDB even after receiving the August 3, 2018 letter and such use continues through the present.

## FIRST CLAIM FOR RELIEF
### (Violation of Defend Trade Secrets Act—18 U.S.C. § 1836)

52. zvelo incorporates by reference the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53. Akamai wrongfully acquired and/or used and/or disclosed trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836, which belong to and are proprietary to zvelo and which derive economic value from the fact that they are not known to others and which are not readily ascertainable by proper means by others.

54. The trade secrets improperly acquired, used, and/or disclosed by Akamai relate to the confidential and proprietary zveloDB, including but not limited to the lexicon of categories developed by zvelo and the millions of URLs categorized by zvelo.

55. The zveloDB is a valuable and lucrative asset of zvelo that constitutes a legally protectable trade secret.

56. zvelo developed and retains all rights to the zveloDB and all information contained therein.

57. To protect its competitive advantage, zvelo has taken steps to protect its highly confidential, proprietary, and valuable zveloDB from improper use or disclosure, including by limiting access to the zveloDB as set forth herein.

58. zvelo's trade secrets are related to a product or service used in interstate commerce, namely products and services that allow enterprises to utilize web, DNS, or URL filtering functionality.

59. The zveloDB, which is a proprietary and valuable trade secret of zvelo, is secret, of value, related to a product or service used in, or intended for use in, interstate or foreign commerce, and thus is a trade secret pursuant to 18 U.S.C. § 1836.

60. Akamai acquired the zveloDB without zvelo's knowledge or permission. Akamai knows, or has reason to know, that zvelo did not consent to Akamai's use of the zveloDB or to the disclosure of the zveloDB to Akamai and that, given the confidential and proprietary nature of the zveloDB, Akamai's use or acquisition of the zveloDB violated 18 U.S.C. § 1836.

61. Akamai has wrongfully benefited from its misappropriation of zvelo's trade secrets, and zvelo has been damaged by this misappropriation in an amount to be determined at trial.

62. Akamai's misappropriation of zvelo's trade secrets for its own benefit was attended by circumstances of fraud, malice, and a willful and wanton disregard of zvelo's rights. Thus, zvelo is entitled to exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

63. As a result of Akamai's misappropriation of zvelo's trade secrets, zvelo has suffered and will continue to suffer great and irreparable harm for which no adequate remedy at law exists. Unless Akamai is preliminarily and permanently enjoined from further misappropriation of zvelo's trade secrets, zvelo will continue to suffer great and irreparable harm for which no adequate remedy at law exists.

**SECOND CLAIM FOR RELIEF**
**(Violation of Colorado Uniform Trade Secrets Act—C.R.S. §§ 7-74-101, *et seq*.)**

64. zvelo incorporates by reference the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65. Akamai wrongfully acquired and/or used and/or disclosed trade secrets within the meaning of the Colorado Uniform Trade Secrets Act, C.R.S. §§ 7-74-101, *et seq.* and under the common law which belong to and are proprietary to zvelo and which derive economic value from the fact that they are not known to others and which are not readily ascertainable by proper means by others.

66. The trade secrets improperly acquired, used, and/or disclosed by Akamai relate to the confidential and proprietary zveloDB, including but not limited to the lexicon of categories developed by zvelo and the millions of categorized URLs.

67. The zveloDB is a valuable and lucrative asset of zvelo that constitutes a legally protectable trade secret.

68. zvelo developed and retains all rights to the zveloDB and all information contained therein.

69. To protect its competitive advantage, zvelo has taken steps to protect its highly confidential, proprietary, and valuable zveloDB from improper use or disclosure, including by limiting access to the zveloDB as set forth herein.

70. zvelo's trade secrets are related to a product or service used in interstate commerce, namely products and services that allow enterprises to utilize web filtering functionality.

71. The zveloDB, which is a proprietary and valuable trade secret of zvelo, is secret, of value and thus is a trade secret pursuant to C.R.S. §§ 7-74-101, *et seq.*

72. Akamai acquired the zveloDB without zvelo's knowledge or permission. Akamai knows, or has reason to know, that zvelo did not consent to Akamai's use of the zveloDB or to

the disclosure of the zveloDB to Akamai and that, given the confidential and proprietary nature of the zveloDB, Akamai's use or acquisition of the zveloDB violated C.R.S. §§ 7-74-101, *et seq.*

73.     Akamai has wrongfully benefited from its misappropriation of zvelo's trade secrets, and zvelo has been damaged by this misappropriation in an amount to be determined at trial.

74.     Akamai's misappropriation of zvelo's trade secrets for its own benefit was attended by circumstances of fraud, malice, and a willful and wanton disregard of zvelo's rights. Thus, zvelo is entitled to exemplary damages pursuant to C.R.S. § 7-74-104(2).

75.     As a result of Akamai's misappropriation of zvelo's trade secrets, zvelo has suffered and will continue to suffer great and irreparable harm for which no adequate remedy at law exists.    Unless Akamai is preliminarily and permanently enjoined from further misappropriation of zvelo's trade secrets, zvelo will continue to suffer great and irreparable harm for which no adequate remedy at law exists.

**THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**

76.      zvelo incorporates by reference the allegations set forth in paragraphs 1 through 75 as if fully set forth herein.

77.      zvelo has invested and continues to invest substantial time, money, and other resources in developing the zveloDB.

78.      Akamai has received the benefit of the substantial time, money, and other resources that zvelo has invested in developing the zveloDB, including by receiving money for products and services that rely on the zveloDB.

79.      Akamai has not compensated zvelo for its use of the zveloDB.

13

80. Under these circumstances, it is unjust for Akamai to retain these benefits.

81. zvelo is therefore entitled to compensation for Akamai's enrichment in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
**(Injunctive Relief)**

82. zvelo incorporates by reference the allegations set forth in paragraphs 1 through 81 as if fully set forth herein.

83. Akamai has engaged in conduct, and continues to engage in conduct, in violation of zvelo's confidential and proprietary trade secret rights.

84. As a result of Akamai's actions, zvelo has sustained and will continue to sustain irreparable injury.

85. zvelo is left without an adequate remedy at law because, among other things, the damage to existing and prospective consumer relationships cannot be determined as a matter of law.

86. Injunctive relief is the only way to remedy Akamai's injurious actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff zvelo, Inc. prays that judgment be entered in its favor and against Defendant Akamai Technologies, Inc. on each and every claim asserted herein, and that it be awarded the following relief:

a. Permanent injunctive relief that prohibits Akamai from continuing to engage in the conduct complained of herein;

b. Monetary damages, including special damages, in an amount to be calculated at trial;

  c. All applicable statutory penalties;

  d. Pre-judgment interest;

  e. Post-judgment interest;

  f. Litigation costs and expenses, including reasonable attorneys' fees; and

  g. Any such further preliminary or permanent relief, including equitable relief, as this Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiff zvelo, Inc. demands a jury trial on all issues so triable.

Respectfully submitted this 10th day of January, 2019.

    KUTAK ROCK LLP

    *s/ Chad T. Nitta*
    Chad T. Nitta
    Blair E. Kanis
    Elizabeth J. Field
    1801 California St., Suite 3000
    Denver, CO 80202
    Tel: 303-297-2400
    Fax: 303-292-7799
    chad.nitta@kutakrock.com
    blair.kanis@kutakrock.com
    elizabeth.field@kutakrock.com

    *ATTORNEYS FOR PLAINTIFF*